For the reasons stated above, defendant Gwynne's motion is denied.

SO ORDERED.

**STAT MEDICAL SERVICES, INC. d/b/a Stat Nurses Registry, Plaintiff,**

v.

**DAUGHTERS OF JACOB GERIATRIC CENTER, INC., Defendant.**

**No. 90 Civ. 4438 (SWK) (SEG).**

United States District Court, S.D. New York.

June 19, 1992.

Lawrence R. Sandak, Sive, Paget & Riesel, P.C., New York City, for plaintiff.

Kenneth A. Hicks, Weisman, Celler, Spett & Modlin, New York City, for defendant.

## OPINION

GRUBIN, United States Magistrate Judge:

Plaintiff, Stat Medical Services, Inc. d/b/a Stat Nurses Registry, ("STAT"), is a California corporation with its principal place of business in Los Angeles. Its primary business is to supply licensed nurses and nurses aides who register with it to hospitals and nursing homes. STAT has had an office in New York since early 1989 and has offices in ten other cities in the United States as well as one in London. Defendant, Daughters of Jacob Geriatric Center, Inc. ("DOJ"), is a not-for-profit corporation operating as a nursing home in the Bronx.

Pursuant to an agreement dated June 26, 1989, STAT began providing temporary nurses to DOJ on an as-needed basis in July 1989. Under the arrangement, STAT paid the nurses directly and sent DOJ weekly invoices which DOJ paid regularly through January 1990. Thereafter, however, DOJ ceased all payments to plaintiff, and it is stipulated by the parties that the outstanding unpaid invoices from February 1990 to September 1990 total $123,770.11. Defendant concedes this amount is due and that it is liable for it unless it can prove the affirmative defense of commercial bribery pursuant to New York Penal Law § 180.00 (McKinney 1988). A bench trial was held herein in October 1991, and defendant contends that it met its burden of proof on the affirmative defense. I, however, find that the evidence fell short of the required standard and, therefore, that judgment must be entered for the plaintiff.

The evidence is undisputed that DOJ's office manager, Marcia Alexander, was hired by STAT in April 1990 for a part-time job during nights and weekends. Under N.Y. Penal Law § 180.00, "[a] person is guilty of commercial bribing in the second degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." Thus, this statute requires three elements which defendant claims were satisfied by STAT's hiring of Alexander: (1) the conferring of a benefit upon her, (2) without DOJ's consent, and (3) with the intent to influence her conduct at DOJ in favor of STAT. If defendant were able to sustain this claim under the statute, plaintiff would be prevented from recovering for the nurses' services provided because it is the law in New York that "a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance." *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 471, 199 N.Y.S.2d 483, 487, 166 N.E.2d 494, 497 (1960). *See also Sirkin v. Fourteenth St. Store*, 124 A.D. 384, 108 N.Y.S. 830, 833–34, 837 (1st Dep't

1908).[1] In other words, public policy prevents a party from profiting in the courts from its own wrongdoing. The first two elements of the defense have been satisfied. STAT's employment of Alexander, for which it paid her a regular salary, may be seen to have conferred a benefit upon her. Second, although plaintiff is hesitant to concede that DOJ was not informed by STAT of its hiring of Alexander, it is fair to say that DOJ's consent was not obtained and that there is no evidence that anyone at DOJ at a supervisory level or higher knew of Alexander's employment with STAT. Defendant has, however, failed to prove the third element of the statute—that STAT's employment of Alexander was done "with intent to influence [her] conduct in relation to [her] employer's or principal's affairs."

 Before turning to the facts of the case, a word should be said about the standard of proof. It is undisputed that defendant bears the burden of proof to show its affirmative defense by clear and convincing evidence. That standard of proof is a high one, as it should be, given the serious allegations of misconduct at issue. The Supreme Court has explained:

> The function of any standard of proof is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." In re Winship, 397 U.S. 358, 370 [90 S.Ct. 1068, 1076, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). By informing the factfinder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision.

Colorado v. New Mexico, 467 U.S. 310, 315–16, 104 S.Ct. 2433, 2437, 81 L.Ed.2d 247 (1984). The "clear and convincing" standard is an intermediate one, in that it is more than a "preponderance" of the evidence but less than "beyond a reasonable doubt." See Addington v. Texas, 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). According to the Supreme Court, a party would achieve the clear and convincing proof standard "only if the material it offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence [its adversary] offered in opposition." Colorado v. New Mexico, 467 U.S. at 316, 104 S.Ct. at 2438. Judge Weinstein of the Eastern District of New York, who teaches evidence at Columbia University School of Law and is a noted author in the field, has declared that "[q]uantified, the probabilities might be in the order of above 70% under a clear and convincing evidence burden." United States v. Fatico, 458 F.Supp. 388, 405 (E.D.N.Y.1978), aff'd, 603 F.2d 1053, (2d Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).

Marcia Alexander had worked for DOJ for approximately three years before the events in question. As DOJ's office manager, her primary responsibilities were essentially clerical—filing, typing, answering phones, keeping a calendar. She performed two other tasks that are of particular relevance here. As invoices from suppliers came in, she reviewed about 75% of them for accuracy before they were sent along to her superiors for approval. In addition, she made calls from time to time to find a temporary nurse to work at DOJ for a sick or absentee nurse. In calling for a temporary nurse, she utilized a nurse availability list given to her, which was prepared and kept on a regular basis by DOJ's nursing staff supervisors. The list showed nurses who were available for duty on the given days, and it included regular DOJ staff nurses as well as agency nurses who would be obtained through nursing agencies. In 1990 DOJ did business with apparently eight nursing agencies of which STAT was one. It was not part of Alexander's regular job duties, however, to obtain temporary nurses. She performed this task approximately once or twice a week and only when specifically told to do so by a nursing supervisor or staffing coordina-

---

1. It may be noted that, even if DOJ had sustained its defense, at most only these monies owed to it by STAT for services incurred after STAT's hiring of Alexander would be nonrecoverable. I reject defendant's contention that the unpaid amounts for the previous approximately four months would be affected.

tor. Alexander testified that her method of proceeding was to start by calling the nurse at the top of the list and simply go down the list until the slot was filled.

In April 1990 Alexander was informed by Don Gonzalez, STAT's New York director of nursing, that STAT was looking to hire a new evening "on-call person." Gonzalez told this to Alexander during one of the regular weekly visits he made to DOJ to pick up the sign-in sheets kept at DOJ that nurses provided by STAT were required to sign upon reporting for work at DOJ. At that time Alexander was looking for new work because she had not received a salary increase at DOJ. It is unknown whether the possibility of her working for STAT was raised by Gonzalez or by Alexander.

On April 23, 1990 Alexander was interviewed at STAT's New York office by Dennis Ferrigno, STAT's regional manager. At the conclusion of the interview, Ferrigno told Alexander she would probably get the job but that final approval had to come from his boss. The following day, Alexander went to STAT's office again for "orientation," during which STAT's staffing coordinator, Desiree Manbodh, explained to her what her duties would be. Alexander took both days as vacation days from DOJ. Based on Ferrigno's recommendation, Kaldeep Brar, STAT's owner and president in Los Angeles, approved the hiring of Alexander. Alexander learned she was hired one week after the interview and began work for STAT on May 10.

Alexander's job for STAT as the "on-call person" was as follows. Commencing 5:30 p.m. each weekday, after STAT's offices closed, she was responsible for receiving at her home telephone calls from hospitals and nursing homes who needed nurses that night. Alexander's working hours at DOJ were 9 a.m. to 5 p.m., and it took her about 15 to 20 minutes to get home. When she arrived home she would speak by phone to Desiree Manbodh, who would wait for Alexander to arrive home and relate to Alexander which STAT nurses were available for work that night. Manbodh then transferred STAT's phone line to Alexander's home. A call to STAT after that time from any health care facility seeking a nurse would be received by Alexander who would then call the nurses on the list told to her by Manbodh. She also performed this job every third weekend, and on two Fridays during the time period in issue she received the weekend list of available nurses from Manbodh not orally, but by fax at DOJ's office.[2]

■■ Defendant essentially argues that because Alexander was in a position at DOJ to aid STAT's business and because STAT benefitted her by employing her without DOJ's consent, it has proved the element of intent and, hence, its affirmative defense of commercial bribery. DOJ bases this argument on what it calls the "law of human nature" that would require Alexander under these circumstances to show favoritism to STAT in connection with her duties at DOJ, and that the court must infer, since this allegedly is the law of human nature, that such is precisely what STAT intended when it hired her. Defendant thus presents its argument as follows on page 8 of its post-trial memorandum: "[T]he law is absolutely clear that the necessary intent to influence an employee flows automatically from the fact of the conferral of the secret benefit, since the natural and proper consequence of the benefit is to cause favoritism on the part of the employee." This court, however, holds to the contrary, because, despite defendant's hyperbole, it appears that such is *not* the law, nor should it be the law.

Defendant's construction of the statute would effectively read out of it the express element of intent, making the statute satisfied simply upon the showing that a party paid some benefit to an employee of a second party with which it did business without the latter's consent. However, if the New York legislature had wanted those circumstances alone to constitute an offense, it certainly would have known how to draft a statute doing so. Instead, it

---

**2.** The second of these faxes happened to be received by her superior at DOJ, which precipitated her termination by DOJ. The situation apparently also caused DOJ to review and terminate its use of all outside nursing agencies which it found had been an unnecessarily costly way to staff its facility.

enacted a statute requiring more—*i.e.*, that the trier of fact be satisfied that these actions were taken by the first party with the intent to influence the employee in relation to his or her employer's business. It is clear from the face of the statute that the legislature did not believe that such intent could be found solely by establishment of the first two elements.

None of the authorities cited by defendant supports its contention. The closest is the following language defendant quotes from *Sears, Roebuck & Co. v. American Plumbing & Supply Co.*, 19 F.R.D. 334 (E.D.Wis.1956), involving a situation in which a defendant supplier paid secret commissions to the purchasing agent of the plaintiff:

> People are presumed to intend the natural and probable consequences of their acts. Payment of secret commissions *under such circumstances* can have only one purpose, namely, that of making the agent of the adverse party beholden to the person giving the secret commissions.

19 F.R.D. at 343 (emphasis added). The circumstances of that case, however, involved secret payments for no return consideration that were simply clear bribes. The agent there did not perform any job such as Alexander performed here. That case, furthermore, was decided under Wisconsin common law, not N.Y. Penal Law § 180.00. Moreover, the court's language on which defendant relies, that "[p]eople are presumed to intend the natural and probable consequences of their acts," was struck down as a jury instruction 23 years *after* this decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), because, according to the Supreme Court, where intent is an element of an offense, the trier of fact must be

made aware that no irrebuttable presumption of it is established simply by a person's acts.[3] I agree with defendant that the situation of the instant case—*i.e.*, a party's hiring of an employee of a second party in a position to influence business without the latter's consent—is itself a factor from which it *may* be inferred that such was done with the intent to influence business affairs.[4] I disagree, however, that those circumstances alone, *without more*, suffice as clear and convincing evidence to prove such intent. In this case, there is no more.

Although defendant relies mainly on its contention concerning intent as discussed above, it does, nevertheless, point to additional evidentiary factors which it maintains support a finding of the requisite intent. I find, however, that the facts are otherwise. Thus, while defendant claims that Gonzalez told Alexander about the availability of the STAT job before he knew she was looking for a second job, the evidence does not support the claim. The testimony was inconclusive as to whether he approached her or vice-versa; moreover, even had he made the initial overture, it would hardly show a nefarious intent. Similarly, although defendant claims her hiring was done with great alacrity, there is no evidence whatsoever that the process of Alexander's hiring was at all at odds with STAT's regular hiring procedures. It appears true that STAT did not inform DOJ of its hiring of Alexander[5] and, as indicated above, that is an element of the statute and certainly one factor tending to support a finding of improper intent. However, defendant's large reliance on the fact that Alexander, herself, did not inform DOJ has little import in and of itself. It is quite clear that Alexander desired as a matter of course to keep private from her

---

**3.** Defendant attempts to distinguish *Sandstrom* by pointing out that it was a criminal case and that the holding applied to presumptions, not inferences. I fail to follow defendant's argument. N.Y.Penal Law § 180.00 is a criminal statute, and, regardless of the standard of proof, the point of the *Sandstrom* holding is that, whether called a presumption, an inference or anything else, intent, when an element of the statute, is not *irrebuttably* established simply by the other elements of the offense, which is precisely what defendant urges.

**4.** It is clear, however, that Alexander's potential for benefitting STAT in any meaningful way, given her role at DOJ, was quite minimal.

**5.** STAT's president testified that he had instructed Ferrigno to inform DOJ prior to Alexander's commencing work for STAT, but there is no evidence that Ferrigno, who was not available as a witness, did so.

employer what she did with her life outside of her working hours at DOJ. There has been no evidence whatsoever presented that STAT told her to keep her employment with STAT a secret from DOJ. We are not concerned here with Alexander's intent, but with STAT's. Yet, to the extent we are going to examine her actions, it should be noted that militating against any notion that she intended affirmatively to hide her employment with STAT is the fact that while she saw no reason to inform her superiors, she did tell her co-worker, DOJ's staffing coordinator Miranda Prevost, of her STAT job. Additionally, when she answered the phone at night for STAT, she did so by saying, in her normal voice, "Thank you for calling STAT; this is Marcia speaking," despite the fact that a DOJ nursing supervisor was as likely as someone from any other facility to be the caller on the other end. That she did not make "pumping" calls for STAT (*e.g.*, calling facilities at night to ask if they needed any nurses) to DOJ shows nothing, since she did not make any pumping calls to any other facilities either. Moreover, that she was instructed by STAT's staffing coordinator Manbodh to make such calls shows that Manbodh, at least, did not know Alexander's employment was to be kept a secret from DOJ. Indeed, Manbodh sent the faxes to her at DOJ and called her there on occasion, clearly acts not to be taken if DOJ were not to know of her employment. Finally, although defendant argues that Alexander did, in fact, favor STAT in connection with DOJ's hiring of temporary nurses, the evidence does not support such a conclusion. While it appears to have been the case that in March and April 1990, DOJ's use of other nursing agencies besides STAT declined,[6] the evidence establishes that DOJ had ceased timely paying the agencies, including STAT, and that at least some of the others refused to do further business with DOJ. Nurses registered with those agencies then registered with STAT so that they could continue obtaining DOJ work. Moreover, the evidence also indicates that STAT paid its nurses a higher rate of compensation than other agencies and that nurses, therefore, who had been working through other agencies, for that additional reason, made themselves available through STAT instead.[7]

In sum, there is certainly not clear and convincing evidence that STAT's hiring of Alexander was intended to have her modify her conduct in some way favorable toward STAT in connection with her duties at DOJ. In addition to the evidence already discussed above, it can be noted that Alexander was clearly a qualified candidate for the STAT nighttime job. She had a college degree in health care administration and obviously, after three years at the nursing home, was knowledgeable about operations in the health care business.[8] She was paid a normal salary for her services, without any "bonuses," "commissions" or any indication that her compensation would be increased in proportion to the volume of work she obtained for STAT nurses. That she worked for DOJ during the day was not something she or STAT supervisors hid from any STAT employee, which one might assume would be done if it were intended

---

6. It should be noted again in this regard that Alexander did not even learn of the STAT job until sometime in April.

7. Defendant also argues that, because Alexander received several phone calls at DOJ from Manbodh concerning her work for several nights and because she received the two faxes there, she was influenced in connection with DOJ's affairs in that she did STAT's work on DOJ's time. According to defendant, that effect upon her was detrimental to DOJ and can be the basis for an inference that STAT had knowledge of the probability of such a consequence at the time STAT hired her.

Even if it were to be held that taking time of an employee away from her regular duties is the kind of influence in connection with a employer's affairs with which the bribery statute is concerned, the *de minimis* amount of time actually spent (or that could have ever been envisioned would have to be spent) makes the argument nonsensical. According to defendant, anytime an employee receives a personal telephone call while at work, the caller thus could be implicated under the commercial bribery statute for taking the employee's time away from the job.

8. Alexander's two predecessors as STAT's "on-call persons" worked in the daytime for the nursing departments of two hospitals in New York City.

that DOJ was not to know of her connection with STAT. Thus, her position at DOJ was known by STAT's staffing coordinators. Desiree Manbodh made calls to DOJs' nursing supervisors on a regular basis, inquiring about their need for nurses, and another STAT coordinator, Jacqueline Paige, would speak on occasion to Alexander's boss at DOJ, Uda Grant, about various matters. Alexander's work for STAT was carried out in an open, routine manner, and she was paid her salary by regular STAT payroll check. After DOJ terminated Alexander's employment, DOJ's director of operations, Michael Brucella, a retired New York Police Department detective, purportedly undertook an investigation of the matter. Yet he testified that he gained no knowledge of any effort by STAT to influence Alexander in the performance of her job at DOJ.

For the above reasons, DOJ's affirmative defense fails. For the same reasons, DOJ's counterclaim, which seeks repayment of the salary DOJ paid to Alexander during the time she was also employed by STAT on the theory that DOJ was deprived of the "undivided loyalty" owed to DOJ as her employer, also fails. (DOJ apparently also seeks to recover on the same theory some other amount representing the purported unspecified fruits of the "bribery.") By defendant's own admission, however, any such claim would require proof of the bribery claim.[9]

Judgment herein shall be entered for the plaintiff for the unpaid invoices together with prejudgment interest at the rate of 9% per annum, for a total to the date hereof of $147,468.81.[10]

---

**9.** To the extent defendant may be arguing that mere "disloyalty" or "unfaithfulness" by Alexander may be sufficient to recover monies from STAT (an argument I would reject on the law), again, these facts fail to establish any such "disloyalty" or "unfaithfulness."

**10.** Interest since October 2, 1991 was calculated, pursuant to the parties' stipulation (Plaintiff's Ex. 2), by multiplying $30.52 by 261 days.