T.C. Summary Opinion 2001-159


UNITED STATES TAX COURT


ESTATE OF PAUL CAMPANA, DECEASED, GAIL CAMPANA, EXECUTRIX AND
GAIL CAMPANA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8812-00S.              Filed September 26, 2001.


Gail Campana, pro se.

<u>Carol-Lynn E. Moran</u>, for respondent.


DEAN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined penalties of $12,264, $15,056, and $30,129 under section 6663(a) for the years 1991, 1992, and 1994, respectively. In the answer, respondent alleges, in the alternative, that if petitioner Gail Campana is not liable for the penalties under section 6663(a) for the years at issue, she is liable for the accuracy-related penalties under section 6662(a), as increases of deficiency under section 6214(a). The issues for decision, therefore, are whether part of the underpayments of tax for the years 1991, 1992, and 1994 is due to fraud, or in the alternative, whether the underpayments are due to negligence or intentional disregard of rules or regulations.

Some of the facts have been stipulated and are so found. The accompanying exhibits are incorporated herein by reference.

## Background

Gail Campana (petitioner) resided in Lavallette, New Jersey, when the petition was filed in this case.

Petitioner and her husband, Paul Campana, operated a driving school for prospective drivers of noncommercial vehicles. They sold the school in 1992.

In 1989 petitioner and Mr. Campana,[1] became investors in CNC Trading Company of Marlton, New Jersey (CNC). CNC was owned and

---

[1] Paul Campana died on May 13, 1992.

primarily operated by Charles N. Cugliari. CNC was held out to potential investors as a food broker and distributor. Mr. Cugliari and CNC employees sold "investments" in CNC "contracts". A contract cost an investor about $25,000 and a half-contract about $12,500. CNC supposedly used investors' money to purchase food products monthly for subsequent sale to food wholesalers and supermarket chains at a profit.

CNC made distributions of a fixed amount of funds to investors each month that was represented to be half of the profits made by CNC on its sales of food products. Typically a full contract would return a monthly amount of about $1,250 to the investor. CNC was in reality a pyramid scheme. Instead of purchasing food products with investors' money, CNC used the money of new investors to make payments to earlier investors.

Petitioner was an investor in CNC from 1989 through part of 1995.

During the year 1991, petitioner and her late husband received distributions of $55,092 from CNC. None of the distributions was reported on their 1991 joint Federal income tax return. Although petitioner received part of her CNC payments in cash, typically, CNC distributions were made monthly by check. Included with the monthly checks petitioner received were "vouchers" indicating: (a) The amount of the investment; (b) a "realization" amount; (c) a "margin" (gain) amount; (d)

petitioner's "share" of the margin amount; and (e) the amount "reinvested" (uniformly it was the amount of the original investment).

The 1991 Federal income tax return of petitioner and Mr. Campana was prepared by Joseph Alfano. Mr. Alfano was an enrolled agent and a self-employed business consultant. At some point during the return preparation phase, before Mr. Alfano asked for documentation for items on the return, petitioner brought up the CNC "investment". She mentioned CNC and showed him a check. She told him where the check came from and described the investment. Mr. Alfano advised petitioner that CNC was not "a normal type of investment".

Petitioner and Mr. Alfano talked about the taxability of the CNC distributions. He asked petitioner if the distributions she had received from CNC exceeded the amount of her investment and she said "no". Mr. Alfano advised her that he did not think that the transaction was concluded. He told petitioner that he did not believe that she would get her "invested" money back and suggested that she try to have it returned to her. Some 4 or 5 months after the initial interview, but before preparing the 1991 return, Mr. Alfano asked if she ever got her money back and she said "no". She may also have shown him an additional check at that time.

Because Mr. Alfano felt that the Campanas would not recover their initial investment in CNC, he decided not to treat CNC distributions as income on the 1991 Federal income tax return. If petitioner and Mr. Campana later were to recover their investment, Alfano felt that an amended return could be filed to change their reporting position. Petitioner did not request Mr. Alfano to prepare subsequent years' returns.

During the year 1992, petitioner and Mr. Campana received from CNC distributions of $58,602. None of the distributions was reported on the joint Federal income tax return for the year. The return was prepared at "Green Baker and Associates" and signed by Gail Campana as surviving spouse.

Petitioner's individual returns for 1993, 1994, and 1995 were prepared by Burton Zocks. During the year 1993 petitioner received from CNC distributions of $104,982. None of the distributions during 1993 was reported on petitioner's 1993 Federal income tax return. The 1992 joint return, which Mr. Zocks reviewed before preparing the 1993 return, reported no CNC income, and petitioner made no mention of CNC to Mr. Zocks at the time. There was a large increase in petitioner's CNC distributions beginning in 1993 because she made a large investment in 1993. As of June of 1993 petitioner and her late husband had invested $258,578 in 12 CNC contracts.

During 1994, petitioner received distributions of $151,272 from CNC. On line 21 of petitioner's return for 1994, she reported receiving $38,275 of miscellaneous investment income from CNC.

Some time in 1994, after the 1993 return was filed, petitioner called Mr. Zocks and asked "a general question relating to when income from an investment should be reported." As part of his preparation of petitioner's 1994 Federal income tax return, Mr. Zocks assembled and mailed to her an "organizer", or questionnaire, based upon information in the previous year's return. Petitioner listed on the organizer her income from different sources. Among the sources of income she disclosed on the organizer for 1994 was "dividend" income from CNC of $38,275 that Mr. Zocks later listed on the return as "miscellaneous investment income" because there was no Form 1099 reporting the distribution. She provided no other details of the CNC investment.

Late in 1994, petitioner asked for her invested money back from CNC and was told in December of 1994 that she could get it back "in three months". CNC became inactive in 1995 when Mr. Cugliari fled to the Cayman Islands.

Eventually, the activities of CNC and its investors came to the attention of the Internal Revenue Service (IRS). Petitioner was one of the individuals whose income tax matters were placed

under scrutiny.  She was contacted by the Criminal Investigation Division (CID) of the IRS about her CNC income and investments. As a result of the contact by CID, petitioner on January 17, 1997, filed amended joint Federal income tax returns for 1991 and 1992, and amended individual tax returns for 1993 and 1994.  The amended returns reported distributions received from CNC in the tax years for which they were filed.

On September 22, 1997, petitioner pleaded guilty to one count of attempted income tax evasion for 1993 in violation of section 7201.  On January 5, 1998, she was ordered imprisoned and fined as her sentence for the guilty plea to attempted evasion of income tax.  On August 10, 1999, petitioner signed Forms 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, agreeing to the assessment of deficiencies in tax for 1991, 1992, 1993, and 1994, as well as the fraud penalty under section 6663 for 1993. Further, petitioner and the Commissioner's delegate signed a Form 906-c, Closing Agreement On Final Determination Covering Specific Matters, agreeing to the amounts of taxable income received by petitioner from CNC for the years 1991 through 1995.

## Discussion

Fraud Penalty

The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454; Rule 142(b); Parks v. Commissioner, 94 T.C. 654 (1990).

As part of his burden in the trial of a fraud case, the Commissioner must first prove an underpayment of some amount of tax. Sec. 6663(a)[2]; Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). To do this, the Commissioner may not merely rely on the taxpayer's failure to disprove the deficiency determination. Parks v. Commissioner, supra. The parties in this case, however, agree that petitioner and her late husband underpaid their income taxes for 1991 and 1992, and that petitioner underpaid her income taxes for and 1994.

Second, the Commissioner must show that at least some part of the underpayment of tax was due to fraud. Sec. 6663(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, supra at 664; Hebrank v. Commissioner, supra. If the Commissioner establishes that some portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to

---

[2]Former sec. 6653 was repealed and replaced by sec. 6663. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), 103 Stat. 2106, 2397.

fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud. Sec. 6663(b).

The Commissioner will meet his burden of proof if it is shown that the taxpayer intended to evade a tax known to be due and owing by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, supra at 874. The Commissioner may prove fraud by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984).

Intent to mislead or conceal may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income for several years, especially when accompanied by other circumstances showing intent to conceal is strong evidence of fraud. Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, supra at 664. An implausible explanation of behavior is one of the "badges of fraud". Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

This Court, however, will not sustain a determination of fraud based only on circumstances that at most create only the suspicion of fraudulent intent. <u>Katz v. Commissioner</u>, 90 T.C. 1130, 1144 (1988); <u>Green v. Commissioner</u>, 66 T.C. 538, 550 (1976); <u>Ross Glove Co. v. Commissioner</u>, 60 T.C. 569, 608 (1973).

Petitioner does not dispute the fraud penalties by arguing here that the CNC payments to her and her late husband were not income. She disputes, however, any allegation that she knew the distributions were income at the time she filed her joint returns for 1991 and 1992. And she alleges that she reported what she thought was the correct amount of income on her individual return for 1994. She argues, in fact, that she relied on the advice of her return preparer in not reporting the CNC distributions as income. According to petitioner, she thought, for the years at issue, that she would not have income from CNC until she recovered her total "investment" in CNC.

### Fraud For 1991 and 1992

Mr. Alfano, the preparer of the joint 1991 return, testified that petitioner brought up the CNC "investment". She mentioned CNC and showed him a check. She told him where the check came from and described the investment. He testified that he told petitioner that CNC was not "a normal type of investment".

Petitioner and Mr. Alfano talked about the taxability of the CNC distributions. He asked whether the checks she had received

exceeded her investment, and she said: "No".  Mr. Alfano advised
her that he did not think that the transaction was concluded.  He
suggested that she try to get her money back but told petitioner
that he did not believe that she would.  Months later, before
preparing the 1991 return, he asked whether she ever got her
money back and she said "no".  Although "no" was a truthful
answer, she did not inform Mr. Alfano that she had not yet asked
for the return of her money.

The weight of authority holds that certain distributions to
taxpayers in "Ponzi"[3] or pyramid schemes (where proceeds of later
investors are used to pay distributions to early investors,
lending an appearance of legitimacy to a fraudulent "investment")
are current income.  Parrish v. Commissioner, T.C. Memo. 1997-
474, affd. 168 F.3d 1098 (8th Cir. 1999); Premji v. Commissioner,
T.C. Memo. 1996-304, affd. without published opinion 139 F.3d 912
(10th Cir. 1998); Wright v. Commissioner, T.C. Memo. 1989-557,
affd. without published opinion 931 F.2d 61 (9th Cir. 1991);
Murphy v. Commissioner, T.C. Memo. 1980-218, affd. per curiam 661
F.2d 299 (4th Cir. 1981); Harris v. United States, 431 F. Supp.
1173 (E.D. Va. 1977).  In all but one of the above cases,
however, the taxpayer had recovered and was in either actual or
constructive receipt of his initial "investment" during the same

---

[3]See Bald Eagle Area School Dist. v. Keystone Fin. Inc., 189
F.3d 321, 323 n.1 (3d Cir. 1999).

taxable year as the Ponzi distributions. In the exceptional case, Parrish, the taxpayer was not a passive investor but was an officer and director of the scheme's corporate vehicle and did not introduce evidence to show either the amounts he invested or received.

In two other cases, where as here, the taxpayer had not recovered the initial investment during the same tax year as the Ponzi distributions, courts have held that the distributions were not income but return of investment funds. Taylor v. United States, 81 AFTR 2d 98-1683, 98-1 USTC par. 50,354 (E.D. Tenn. 1998); Greenberg v. Commissioner, T.C. Memo. 1996-281.

Mr. Alfano advised petitioner that she would not have income from CNC until she had recovered distributions in excess of her investment and that due to its "unusual" nature, he did not think she would recover her investment. Regardless of the accuracy of the advice given by Mr. Alfano, however, the question is whether petitioner believed the advice to be correct. See Cheek v. United States, 498 U.S. 192 (1991); see also TWA. v. Thurston, 469 U.S. 111, 126-128 (1985); Amos v. Commissioner, 43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965).

Respondent's unstated argument must be that petitioner knew that the CNC distributions represented income that the law required her to report, and despite this knowledge she intentionally, or recklessly failed to report it. Respondent did

not introduce evidence that petitioner's distributions in 1991 and 1992 exceeded her investment or that she knew that they exceeded her investment.  The record tends to the opposite inference.  Petitioner did not ask for her money back, but the Court is left to wonder why.

While we are suspicious of petitioner's motives and inaction, suspicion is not evidence.  When weighed against the evidence in opposition, the evidence adduced by respondent does not "instantly tip the evidentiary scales" in the direction of fraudulent intent on petitioner's part.  See <u>Colorado v. New Mexico</u>, 467 U.S. 310, 316 (1984).  Respondent has not shown by clear and convincing evidence that part of the underpayment of tax for the years 1991 and 1992 is due to fraud.  <u>Id.</u>

<u>Fraud For 1994</u>

While it is clear that petitioner received some distributions, respondent is unable to determine how much was disbursed by CNC to petitioner and her late husband in 1989 and 1990, some of which may have been in cash.  The parties agree, however, that a total of $370,000 was distributed to petitioner and her late husband over the 4 years including 1991, 1992, 1993, and 1994.  Since a total of approximately $258,000 had been invested by June of 1993, at the end of 1994 petitioner clearly had completely recovered her investment plus close to an additional $112,000.

Petitioner was circumspect about her CNC involvement when Mr. Zocks, her accountant, prepared her return for 1994. Some time in 1994 she called him and asked "a general question" about when to report income from an investment. She did not show him any CNC checks or vouchers, or give any specifics about CNC. Mr. Zocks assembled and mailed to her a questionnaire, based upon information in the previous year's return. Among the sources of income petitioner disclosed on the organizer for 1994 was "dividend" income from CNC of $38,275 that Mr. Zocks later reported on the return as "miscellaneous investment income".

Petitioner explained at trial that she came up with the 1994 reported CNC income figure through the following steps: (1) She totaled what was received from CNC from December 31, 1991,[4] through December 31, 1994, which she determined to be $314,000; (2) before her husband died in May of 1992 "he said we needed approximately $18,000 more to start retaining a profit from CNC"; (3) she deducted the $258,000 that was invested from the $314,000 which left $56,278; and (4) she then deducted "the $18,000 that [her husband] said we still needed, and came out with the figure of $38,278." The Court finds this to be an implausible explanation.

---

[4]On petitioner's amended returns for 1991 through 1994, she reported income from CNC in amounts somewhat less than those finally agreed upon with respondent: $48,144, $52,061, $104,982, and $112,997, respectively, for a total of $318,184. The discrepancies are unexplained.

The Court assumes that petitioner misspoke in her testimony about the exclusion of the year 1991 from her computation of CNC distributions.  Petitioner, however, did not explain why she excluded from her computation distributions she and her late husband received from CNC in 1989 and 1990.  Also, if she were following her husband's instruction before he died in May of 1992 that they needed only approximately $18,000 more to "start retaining a profit from CNC", almost all distributions in 1992 ($58,602) would have been "profit".

Even assuming that petitioner believed that she would not realize income from CNC until she had recovered distributions in excess of her combined investment, she must have known that for 1994, certainly, she had realized more income than she reported on her tax return.  She failed to disclose to the certified public accountant, who was preparing her tax return for the year, and would have assisted her, any explanation of the CNC investments.

For the year 1994 respondent has shown by clear and convincing evidence a pattern of underreporting of income accompanied by an intent to mislead or conceal and an implausible explanation of behavior.  We find that the underpayment of tax on petitioner's 1994 return was due to fraud.  See Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, 94 T.C. at 664 (1990); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir.

1986), affg. T.C. Memo. 1984-601. Because petitioner has not established that any portion of the underpayment is not attributable to fraud, we hold that she is liable for the fraud penalty on the entire amount of the underpayment.

Negligence For 1991 and 1992

Should the Court determine that petitioner is not liable for the addition to tax for fraud, respondent alleges that she is liable for the accuracy-related penalty for negligence for the years 1991 and 1992. Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment of tax shown to be attributable to negligence or intentional disregard of rules or regulations.

Negligence includes "any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." Chamberlain v. Commissioner, 66 F.3d 729, 732 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228. Generally, courts look both to the underlying investment and to the taxpayer's position taken on the return in evaluating whether a taxpayer was negligent. Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.

Under some circumstances, however, a taxpayer may avoid liability for the accuracy-related penalty for negligence if

reasonable reliance on a competent professional adviser is shown. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969) affg. T.C. Memo. 1968-98; Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such reliance is not an absolute defense to negligence but is merely a factor to be considered. Id.

For reliance on professional advice to excuse a taxpayer from the negligence penalty, the taxpayer must show that the professional adviser had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. Leonhart v. Commissioner, supra; Freytag v. Commissioner, supra; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

In order for reliance on professional advice to excuse a taxpayer from the negligence penalty, the reliance must be reasonable, in good faith, and based upon full disclosure. Zfass v. Commissioner, 118 F.3d 184, 188 (4th Cir. 1997), affg. T.C. Memo. 1996-167; Freytag v. Commissioner, supra at 888. We do not find such reliance on petitioner's part.

Petitioner's return preparer strongly suggested to her that CNC did not sound like a "normal" investment and that her investment funds were in jeopardy. He advised her that she should attempt to recover her investment. Petitioner offered no evidence that she could not have recovered her investment at any

time. It is possible that petitioner could have recovered her investment at the time of Mr. Alfano's advice. If so, she might have been in constructive or actual receipt of her investment and the CNC distributions. See Wright v. Commissioner, T.C. Memo. 1989-557. Had petitioner recovered her investment, Mr. Alfano may have advised taking a different return position. Petitioner failed to heed Mr. Alfano's advice, left him with the impression that she had attempted and failed to have her investment refunded, and invested additional funds in the pyramid scheme. She apparently made no attempt to find out any further information about her invested funds or CNC other than that it had an office with a desk and a computer.

The Court finds that petitioner failed reasonably to attempt to comply with the tax code and regulations. Her actions evidence a lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. See Chamberlain v. Commissioner, supra.

### Conclusion

We hold that petitioner is not liable for the fraud penalties under section 6663(a) but is liable for the accuracy-related penalties under section 6662(a) for negligence or intentional violation of rules or regulations for 1991 and 1992. We hold that respondent's determination that the underpayment of tax for the year 1994 is due to fraud is correct, and petitioner

is liable for the fraud penalties under section 6663(a) for that year.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.