(Slip Opinion)    OCTOBER TERM, 2020    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORIDA *v.* GEORGIA

### ON EXCEPTIONS TO SECOND REPORT OF SPECIAL MASTER

No. 142, Orig.    Argued February 22, 2021—Decided April 1, 2021

This case involves a dispute between Florida and Georgia concerning the proper apportionment of interstate waters.  Florida brought an original action against Georgia alleging that its upstream neighbor consumes more than its fair share of water from interstate rivers in the Apalachicola-Chattahoochee-Flint River Basin.  Florida claims that Georgia's overconsumption of Basin waters caused low flows in the Apalachicola River which seriously harmed Florida's oyster fisheries and river ecosystem.  The first Special Master appointed by the Court to assess Florida's claims recommended dismissal of Florida's complaint.  The Court disagreed with the Special Master's analysis of the threshold question of redressability, and remanded for the Special Master to make definitive findings and recommendations on several issues, including: whether Florida had proved any serious injury caused by Georgia; the extent to which reducing Georgia's water consumption would increase Apalachicola River flows; and the extent to which any increased Apalachicola flows would redress Florida's injuries.  *Florida* v. *Georgia*, 585 U. S. ___.  Following supplemental briefing and oral argument, the Special Master then reviewing the case produced an 81-page report recommending that the Court deny Florida relief.  Relevant here, the Special Master concluded that Florida failed to prove by clear and convincing evidence that Georgia's alleged overconsumption caused serious harm either to Florida's oyster fisheries or to its river wildlife and plant life.  Florida filed exceptions.

*Held*: Florida's exceptions to the Special Master's Report are overruled, and the case is dismissed. Pp. 4–10.

 (a) The Court has original jurisdiction to equitably apportion interstate waters between States.  Given the competing sovereign interests in such cases, a complaining State bears a burden much greater than does a private party seeking an injunction.  Florida concedes that it

Syllabus

cannot obtain an equitable apportionment here unless it first proves by clear and convincing evidence a serious injury caused by Georgia. The Court conducts an independent review of the record in ruling on Florida's exceptions to the Special Master's Report. *Kansas* v. *Nebraska*, 574 U. S. 445, 453. Pp. 4–5.

(b) Florida has not proved by clear and convincing evidence that the collapse of its oyster fisheries was caused by Georgia's overconsumption. The oyster population in the Bay collapsed in 2012 in the midst of a severe drought. Florida attempts to show that Georgia's alleged unreasonable agricultural water consumption caused reduced river flows, which in turn increased the Bay's salinity, which in turn attracted saltwater oyster predators and disease, decimating the oyster population. Georgia offers contrary evidence that Florida's mismanagement of its fisheries, rather than reduced river flows, caused the decline. Florida's own documents and witnesses reveal that Florida allowed unprecedented levels of oyster harvesting in the years leading to the collapse. And the record points to other potentially relevant factors, including actions of the U. S. Army Corps of Engineers, multiyear droughts, and changing rainfall patterns. The precise causes of the Bay's oyster collapse remain a subject of scientific debate, but the record evidence establishes at most that increased salinity and predation contributed to the collapse of Florida's fisheries, not that Georgia's overconsumption caused the increased salinity and predation. Florida fails to establish that Georgia's overconsumption was a substantial factor contributing to its injury, much less the sole cause. As such the Court need not address the causation standard applicable in equitable-apportionment cases. Pp. 5–9.

(c) Florida also has not proved by clear and convincing evidence that Georgia's overconsumption has harmed river wildlife and plant life by disconnecting tributaries, swamps, and sloughs from the Apalachicola River, thereby drying out important habitats for river species. The Special Master found "a complete lack of evidence" that any river species has suffered or will suffer serious injury from Georgia's alleged overconsumption, Second Report of Special Master 22, and the Court agrees with that conclusion. Pp. 9–10.

Exceptions overruled, and case dismissed.

BARRETT, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 142, Orig.

———

## STATE OF FLORIDA, PLAINTIFF *v.* STATE OF GEORGIA

### ON EXCEPTIONS TO SECOND REPORT OF SPECIAL MASTER

[April 1, 2021]

JUSTICE BARRETT delivered the opinion of the Court.

For the second time in three years, we confront a dispute between Florida and Georgia over the proper apportionment of interstate waters. Florida, the downstream State, brought this original action against Georgia, claiming that Georgia consumes more than its fair share of water from an interstate network of rivers. Florida says that Georgia's overconsumption harms its economic and ecological interests, and it seeks a decree requiring Georgia to reduce its consumption.

When the case was last before the Court, we resolved it narrowly and remanded to a Special Master with instructions to make findings and recommendations on additional issues. *Florida* v. *Georgia*, 585 U. S. \_\_\_ (2018). On remand, the Special Master recommended that we deny Florida relief for several independent reasons, including that Florida proved no serious injury caused by Georgia's alleged overconsumption.

Based on our independent review of the record, we agree with the Special Master's recommendation. We therefore overrule Florida's exceptions to the Special Master's Report and dismiss the case.

I

This case concerns the Apalachicola-Chattahoochee-Flint River Basin, an area spanning more than 20,000 square miles in Georgia, Florida, and Alabama. The Basin contains three rivers. The Chattahoochee River and the Flint River start in Georgia and empty into Lake Seminole, which straddles the Georgia-Florida border. Both rivers are critical sources of water for Georgia. The Chattahoochee is the primary water supply for the Atlanta metropolitan area, while the Flint supplies irrigation to southwestern Georgia's agricultural industry.

The third river in the Basin is the Apalachicola River. It starts from the southern end of Lake Seminole and flows south through the Florida Panhandle, emptying into the Apalachicola Bay (Bay), near the Gulf of Mexico. The Apalachicola River supports a wide range of river wildlife and plant life in the Florida Panhandle, and its steady supply of fresh water makes the Bay a suitable habitat for oysters. For many years, Florida's oyster fisheries were a cornerstone of the regional economy.

Many factors influence Apalachicola River flows, including precipitation, air temperature, and Georgia's upstream consumption of Basin waters. The U. S. Army Corps of Engineers also plays an important role. The Corps regulates Apalachicola flows by storing water in, and releasing water from, its network of reservoirs in the Basin. In recent years, low flows in the Apalachicola River have become increasingly common during the dry summer and fall months, particularly during droughts.

In 2013, on the heels of the third regional drought in just over a decade, Florida brought this original action against Georgia, seeking an equitable apportionment of the Basin waters. See 28 U. S. C. §1251(a); U. S. Const., Art. III, §2. Florida asserts that Georgia's overconsumption of Basin waters causes sustained low flows in the Apalachicola

River, which in turn harm its oyster fisheries and river ecosystem. As a remedy, Florida seeks an order requiring Georgia to reduce its consumption of Basin waters. Florida does not seek relief against the Corps.

We granted Florida leave to file its complaint and referred the case to Special Master Ralph Lancaster, Jr. After 18 months of extensive discovery and a 5-week trial, the Special Master issued a report recommending that Florida be denied relief. Although the Special Master assumed for the sake of his analysis that Florida had suffered serious injuries due to Georgia's upstream water use, he determined that it was unnecessary to make definitive findings on those issues because Florida failed to prove by clear and convincing evidence that any remedy would redress its asserted injuries. That was so because a remedial decree would not bind the Corps, which could operate its reservoirs to offset any added streamflow produced by the decree.

On review of Florida's exceptions to the Special Master's Report, we remanded for further proceedings. *Florida* v. *Georgia*, 585 U. S. \_\_\_. We concluded that the Special Master's clear and convincing evidence standard for the "'threshold'" question of redressability was "too strict," at least absent further findings. *Id.,* at \_\_\_–\_\_\_ (slip op., at 15–16). We then directed the Special Master to make definitive findings and recommendations on several additional issues, including: whether Florida had proved any serious injury caused by Georgia; the extent to which reducing Georgia's water consumption would increase Apalachicola River flows; and the extent to which any increased Apalachicola flows would redress Florida's injuries. *Id.,* at \_\_\_–\_\_\_ (slip op., at 36–37).

Soon after our decision in *Florida*, Special Master Lancaster retired, and we appointed Judge Paul Kelly as the Special Master. Following supplemental briefing and oral argument, Special Master Kelly issued an 81-page report recommending, for several independent reasons, that this

Court deny Florida relief. Relevant here, the Special Master concluded that Florida failed to prove by clear and convincing evidence that Georgia's alleged overconsumption caused serious harm to Florida's oyster fisheries or its river wildlife and plant life. Second Report of Special Master 8–25.

Florida again filed exceptions to the Special Master's Report. We must "conduct an independent review of the record, and assume the ultimate responsibility for deciding all matters." *Kansas* v. *Nebraska*, 574 U. S. 445, 453 (2015) (internal quotation marks omitted). Having done so, we overrule Florida's exceptions and adopt the Special Master's recommendation.

II

"This Court has recognized for more than a century its inherent authority, as part of the Constitution's grant of original jurisdiction, to equitably apportion interstate streams between States." *Id.,* at 454. Given the weighty and competing sovereign interests at issue in these cases, "a complaining State must bear a burden that is 'much greater' than the burden ordinarily shouldered by a private party seeking an injunction." *Florida*, 585 U. S., at ___ (slip op., at 12).

Here, Florida must make two showings to obtain an equitable apportionment. First, Florida must prove a threatened or actual injury "of serious magnitude" caused by Georgia's upstream water consumption. See *id.,* at ___, ___ (slip op., at 12, 19) (internal quotation marks omitted); *Colorado* v. *New Mexico*, 459 U. S. 176, 187, n. 13 (1982) (*Colorado I*). Second, Florida must show that "the benefits of the [apportionment] substantially outweigh the harm that might result." *Id.,* at 187. Because Florida and Georgia are both riparian States, the "guiding principle" of this analysis is that both States have "an equal right to make a reasonable use" of the Basin waters. *Florida*, 585 U. S., at ___ (slip

op., at 11) (emphasis deleted; internal quotation marks omitted).

To resolve this case, we need address only injury and causation. Florida asserts that Georgia's overconsumption of Basin waters caused it two distinct injuries: the collapse of its oyster fisheries and harm to its river ecosystem. Florida does not dispute that it must prove injury and causation by clear and convincing evidence. See *Colorado I*, 459 U. S., at 187, n. 13. To do so, Florida must "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado* v. *New Mexico*, 467 U. S. 310, 316 (1984) (*Colorado II*).

With Florida's heavy burden in mind, we address its asserted injuries in turn.

## A

In 2012, in the midst of a severe drought, the oyster population in the Apalachicola Bay collapsed, causing commercial oyster sales to plummet. By the time of trial, the Bay's fisheries had yet to recover. All agree that this is an injury "of serious magnitude" under our equitable-apportionment precedents. See *New York* v. *New Jersey*, 256 U. S. 296, 309 (1921).

The parties, however, offer competing explanations for the *cause* of the collapse. Florida pins the collapse on Georgia through a multistep causal chain. It argues that Georgia's unreasonable agricultural water consumption caused sustained low flows in the Apalachicola River; that these low flows increased the Bay's salinity; and that higher salinity in the Bay attracted droves of saltwater oyster predators and disease, ultimately decimating the oyster population.

Georgia points to a more direct cause—Florida's mismanagement of its oyster fisheries. According to Georgia, Florida caused the collapse by overharvesting oysters and failing to replace harvested oyster shells. And even if low flows

contributed at all, Georgia says, they were driven by climatic changes and other factors, not its upstream consumption.

Of course, the precise causes of the Bay's oyster collapse remain a subject of ongoing scientific debate. As judges, we lack the expertise to settle that debate and do not purport to do so here. Our more limited task is to evaluate the parties' arguments in light of the record evidence and Florida's heavy burden of proof. And on this record, we agree with the Special Master that Florida has failed to carry its burden.

Florida's own documents and witnesses reveal that Florida allowed unprecedented levels of oyster harvesting in the years before the collapse. In 2011 and 2012, oyster harvests from the Bay were larger than in any other year on record. Fla. Exh. 839; 4 Trial Tr. 956; 6 Trial Tr. 1391. That was in part because Florida loosened various harvesting restrictions out of fear—ultimately unrealized—that the Deepwater Horizon oil spill would contaminate its oyster fisheries. 3 Trial Tr. 767–769. A former Florida official, one of Florida's lead witnesses, acknowledged that these management practices "'bent'" Florida's fisheries "'until [they] broke.'" Ga. Exh. 1357, p. 1; 4 Trial Tr. 877.

The record also shows that Florida failed to adequately reshell its oyster bars. Reshelling is a century-old oyster-management practice that involves replacing harvested oyster shells with clean shells, which can serve as habitat for young oysters. *Id.,* at 907–908; 17 Trial Tr. 4390. Yet in the years before the collapse, while Florida was harvesting oysters at a record pace, it was simultaneously reshelling its oyster bars at a historically low rate. See Direct Testimony of Romuald N. Lipcius ¶¶138–151 (Lipcius), and Demos. 15, 16; see also Ga. Exh. 568, p. 5 (recommending that Florida reshell 200 acres per year); 7 Trial Tr. 1692 (Florida reshelled 180 total acres in the 10 years before the collapse).

Georgia's marine ecologist, Dr. Lipcius, demonstrated the stark effects of Florida's increased harvesting and lax reshelling efforts. Analyzing data on oyster densities precollapse and postcollapse, Dr. Lipcius found that mean densities in the Bay's most heavily harvested oyster bars dropped by an average of 78%, while mean densities *increased* by 3% to 13% at bars that either were not heavily harvested or had been reshelled. Lipcius ¶¶41–44. Dr. Lipcius also found negligible differences in salinity among the bars that he analyzed, suggesting that increased salinity did not explain the variance in oyster densities. *Id.,* ¶¶48–51.

Florida does not meaningfully rebut this evidence. Yet Florida nonetheless argues that Georgia's overconsumption—and the consequent increased salinity and predation—was the *sole* cause of the collapse, or at least a substantial factor contributing to it.* But here again, Florida's own witnesses suggest otherwise.

Dr. White, one of Florida's ecology experts, modeled how oyster biomass would have changed at two of the Bay's major oyster bars if Georgia had consumed less water in the years leading up to the collapse. His modeling showed that reducing Georgia's consumption by an amount "similar to the relief that Florida is requesting" in this case would have increased oyster biomass by less than 1.5% in 2012. Updated Pre-Filed Direct Testimony (PFDT) of J. Wilson White 49–51, figs. 14, 15.

Florida does not explain how such minor fluctuations in oyster biomass could have averted the collapse. Instead, Florida points to testimony that increased streamflow would have had "larger" effects on oyster biomass at oyster bars closer to the river's mouth. 7 Trial Tr. 1725; see also

--------

*We have not specified the causation standard applicable in equitable-apportionment cases. We need not do so here, for Florida has failed to establish a sufficient causal connection under any of the parties' proposed standards.

*id.,* at 1868–1870. But it was Florida's burden to quantify *how much* larger the effects would have been, and its experts did not model biomass changes at bars near the river. See 6 Trial Tr. 1571.

Other Florida experts reinforced Dr. White's biomass findings. One expert found that salinity reductions of greater than 10 parts per thousand are "required" in order to reduce predation by rock snails—one of the oyster's fiercest predators. Fla. Exh. 797, p. 38; Updated PFDT of Mark Berrigan ¶¶42–43 (Berrigan). Yet according to another Florida expert, salinity throughout the Bay would have declined by substantially *less* than 10 parts per thousand in 2012 even if Georgia had eliminated *all* of its consumption from the Basin. PFDT of Marcia Greenblatt ¶¶4, 27, 30. Together, these findings further undermine the asserted link between Georgia's consumption and decreased oyster biomass.

In response to this empirical evidence, Florida relies primarily on: (1) testimony from a local oysterman and a former Florida official that they witnessed high salinity and significant oyster predation, including at private oyster bars not subject to overharvesting, PFDT of Thomas L. Ward ¶¶33–37; Berrigan ¶¶44–48; (2) reports by its own agency blaming the collapse in part on salinity and predation, Joint Exhs. 50, 77; (3) a fishery-disaster declaration by the National Oceanic and Atmospheric Administration (NOAA) adopting the conclusion of Florida's agency, Fla. Exh. 413, p. 3; and (4) field experiments conducted by one of Florida's experts in the years *after* the collapse, which purport to demonstrate a link between increased salinity and predation, Updated PFDT of David Kimbro ¶¶63–90.

The fundamental problem with this evidence—a problem that pervades Florida's submission in this case—is that it establishes at most that increased salinity and predation contributed to the collapse, not that *Georgia's overconsumption* caused the increased salinity and predation. None of

these witnesses or reports point to Georgia's overconsumption as a significant cause of the high salinity and predation. The NOAA, in fact, primarily blamed "prolonged drought conditions" and the Corps' reservoirs operations—not Georgia's consumption during drought conditions—for the elevated levels of salinity and predation in the Bay. Fla. Exh. 413, pp. 3–4. Other record evidence, moreover, indicates that the unprecedented series of multiyear droughts, as well as changes in seasonal rainfall patterns, may have played a significant role. See PFDT of Dennis Lettenmaier 17, fig. 8; Direct Testimony of Wei Zeng ¶¶144–152. Given these confounding factors, we do not think that Florida's evidence of high salinity and predation overcomes the data and modeling of its own experts, which show that Georgia's consumption had little to no impact on the Bay's oyster population.

Considering the record as a whole, Florida has not shown that it is "highly probable" that Georgia's alleged overconsumption played more than a trivial role in the collapse of Florida's oyster fisheries. See *Colorado II*, 467 U. S., at 316. Florida therefore has failed to carry its burden of proving causation by clear and convincing evidence.

B

Florida also argues that Georgia's overconsumption has harmed river wildlife and plant life by disconnecting tributaries, swamps, and sloughs from the Apalachicola River, thereby drying out important habitats for river species. The Special Master found "a complete lack of evidence" that any river species suffered serious injury from Georgia's alleged overconsumption, and we agree. Second Report of Special Master 22.

In seeking to prove injury, Florida relied primarily on species-specific "harm metrics" developed by Dr. Allan, one of its ecology experts. Dr. Allan established minimum river-flow regimes that he believed necessary for certain

species of fish, mussels, and trees to avoid "significant harm" during dry months. Updated PFDT of J. David Allan ¶¶33–61 (Allan). He then sought to quantify the harm to each species by totaling the number of days in which river flows fell below his thresholds. *Id.,* ¶¶62–63.

What Dr. Allan did *not* do, however, is show that his harm metrics did or likely would translate into real-world harm to the species that he studied. Indeed, Dr. Allan provided no data showing that the overall population of *any* river species has declined in recent years. See 2 Trial Tr. 389–392, 395–396. And other evidence casts significant doubt on Dr. Allan's harm metrics. For instance, the U. S. Fish & Wildlife Service found that the population of the fat threeridge mussel—one of the species Dr. Allan analyzed— "appears stable and may be increasing in size." Joint Exh. 168, p. 125; Allan ¶42.

Without stronger evidence of *actual* past or threatened harm to species in the Apalachicola River, we cannot find it "highly probable" that these species have suffered serious injury, let alone as a result of any overconsumption by Georgia. See *Colorado II*, 467 U. S., at 316.

\*    \*    \*

In short, Florida has not met the exacting standard necessary to warrant the exercise of this Court's extraordinary authority to control the conduct of a coequal sovereign. We emphasize that Georgia has an obligation to make reasonable use of Basin waters in order to help conserve that increasingly scarce resource. But in light of the record before us, we must overrule Florida's exceptions to the Special Master's Report and dismiss the case.

*It is so ordered.*